USDC- GREENBELT
'24 JUL 22 AM 8:37

HD

Rcv'd by: _____

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

SEBASTIAN A. CAMPBELL          )
                                )
      Petitioner,               )
                                )
v.                              )          Civil Action No.: 1:21-cv-3127-LKG
                                )
                                )          Dated:  July 18, 2024
                                )
WARDEN JEFF NINES, and          )
THE ATTORNEY GENERAL OF THE     )
STATE OF MARYLAND               )
                                )
      Respondents.              )
                                )
                                )

## MEMORANDUM OPINION

Self-represented Petitioner, Sebastian A. Campbell, filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254, challenging his 2017 conviction in the Circuit Court for Montgomery County, Maryland for second degree rape and sexual abuse of a minor.  ECF No. 1. Respondents filed an Answer arguing Campbell's claims are procedurally defaulted or lack merit. ECF No. 8.  Campbell responded.  ECF Nos. 25, 26.  Campbell has also filed a Motion for an Evidentiary Hearing (ECF Nos. 29, 31, 34), which Respondents oppose.  ECF No. 30.

For the reasons that follow, the Petition and Campbell's Motion for an Evidentiary Hearing (ECF No. 29) and Motion for an Extension of Time (ECF No. 34) shall be **DENIED**, and a certificate of appealability shall not issue.

## I.    BACKGROUND

### A.  Trial

On May 18, 2017, Campbell was indicted in the Circuit Court for Montgomery County on two counts of sexual abuse of a minor and four counts of second-degree rape.  ECF No. 9-1 at 69-71.  At a series of pretrial hearings, Campbell waived his right to counsel and invoked his right to self-representation.  ECF No. 9-3, 9-4, 9-6.  After a trial by jury held on August 14-17, 2017, Campbell was found guilty as charged.  ECF Nos. 9-8, 9-9, 9-10, 9-11, 9-12.

The following facts were adduced at trial[1]:

[Seventeen-year-old, T.B.] testified that in February of 2012, she moved to Maryland and lived with her father, [Campbell], in an apartment located at 37 Maryland Avenue, Rockville Montgomery County, Maryland. She also testified that she resided at the Maryland Avenue apartment along with [Campbell's] live-in girlfriend, Azeb Tesema and her little brother Christian Campbell. [T.B.] explained to the jury that [Campbell's] girlfriend, Azeb Tesema, agreed to [Campbell's] family, including [T.B.], move into her apartment in Rockville, Maryland. [T.B] further explained that Azeb Tesema also goes by another name, Aliyah Tiruneh.

At trial, [T.B] was asked, on direct, by the State "Did there come a time that your dad touched you inappropriately?" [T.B.] answered "Yes" and then described the first incident where [T.B.] "woke up to [Campbell] pulling my pants down." [T.B.] also stated that [Campbell] "placed his hands over my mouth" and "then he raped me." She explained that she was "almost 12" at this time. The State then asked [T.B.] what she meant when she stated that [Campbell] raped you? [T.B.] responded by stating "he stuck his penis in me [vagina]." [T.B.] then described, in detail, how the rape "hurt," and that I was "bleeding for a day." In order to stop the bleeding, [T.B.] testified she was forced to "use pads" until it was controlled. [T.B.] also stated that this was the first time that she ever had sex.

[T.B.] also described the last time [Campbell] raped her at Aliyah Tiruneh's apartment, located at 37 Maryland Avenue, Rockville, Montgomery County, Maryland. Specifically, [T.B.] testified that she "woke up to get a midnight snack and [Campbell] came from the master bedroom and walked into the kitchen with her." "[Campbell] then bent me [her] over the counter, pulled my shorts down, and stuck his penis in me." [T.B.] was then asked, "how often did your father do that to you while you lived at 37 Maryland Avenue?" [T.B.] replied that [Campbell] raped her "at least twice a week."

[T.B.] also stated that [Campbell] "made me perform oral sex" around the time they moved to a new Gaithersburg apartment at 725 Fallsgrove. [T.B.] went onto explain that [Campbell] repeatedly raped her at the 725 Fallsgrove apartment. Specifically, [Campbell] first raped her at 725 Fallsgrove when "my brother had been sent to school and Aliyah was at work." [Campbell] continued to rape her about "twice a week" at the 725 Fallsgrove apartment. [T.B.] further testified that [Campbell] never enrolled her into the Montgomery County Public School system while she lived in Montgomery County, Maryland. Specifically, [T.B.] testified that she did not interact with friends or other people her age because [Campbell] secluded her in the apartment. The only activity that [Campbell] allowed [T.B.] to do was playing video games inside the apartment.

---

[1]    After reviewing the state court record, the Court determined that the trial court's August 15, 2019 opinion denying Campbell's Motion for a New Trial (12/4/2018) contains the most thorough recitation of the facts adduced at trial. The Court has conducted an independent review of the trial transcripts and finds the trial court's summary to be an accurate reflection of the testimony and evidence received at the trial.

The State next asked [T.B.] "Did there come a time that you realized you were pregnant?" [T.B.] answered "Yes" and that she "did not realize until months after the fact when [she] had missed [her] period for the second or third month in a row." [T.B.] added that she told [Campbell] and "he went to the store and brought home a pregnancy test, which came back positive." After the positive pregnancy test, [Campbell] made [T.B.] wear baggy shirts so that Aliyah would not discover that she was pregnant. [T.B.] also testified that [Campbell's] actions did not stop with his knowledge that she was pregnant. She explained that [Campbell] continued to rape [her], even when she was pregnant.

[T.B.'s] testimony then turned to the birth of her daughter, [P.C.]. She testified that her daughter, [P.C.], was born on August 21, 2013. She explained to the jury that whenever she was at the hospital, [Campbell], her Father, directed her "use a fake name every time [she] went to the hospital." Specifically, [Campbell] instructed [T.B.] to use the name "Toni Campbell" at the hospital. The State then asked [T.B.] "do you know somebody named Toni Campbell?" [T.B.] responded, "[Campbell's] mom." [Campbell] also told the hospital staff that he was either "my father or grandfather."

The State also asked [T.B.] "when you received emails from [Campbell], after he left Maryland, and you continued to live in Maryland, did you use a different name in those emails?" [T.B.] stated "yes" and that she used "the email address...tonicampbell@gmail.com." The State then asked [T.B.] if [Campbell] ever raped her outside of the Montgomery County apartments. [T.B.] responded, in the affirmative, testifying that [Campbell] sometimes raped her "in his car's backseat." [T.B.] was next asked if she ever told anybody about [Campbell] raping her in the apartments or car. [T.B.] responded "no" because [Campbell] told her not to tell anyone. The State then asked [T.B.] if she "ever tried to fight back" against [Campbell] when he was raping her. [T.B.] stated that she did attempt to resist, but "[Campbell] would assault me." [T.B.] further explained that she stopped resisting because "I was tired of the assaults" by [Campbell].

Later in her trial testimony, [T.B.] described a time that she moved back to a group home in Michigan. Specifically, in May of 2016, [T.B.] was a passenger in the group home's van, traveling to drop off students at school. During this time, [T.B.] observed that a car was following the van and eventually realized that [Campbell] was driving the car. During this incident, [T.B.] next observed that [Campbell] was motioning to her to get out of the moving van and come with him. [T.B.] refused to go with [Campbell] and [Campbell] drove off. This incident served as the catalyst for [T.B.] deciding to tell the Director of the Michigan group home that [Campbell] had raped her and was her daughter's father.

Following [T.B.'s] disclosure of [Campbell's] actions that occurred in Montgomery County, Maryland, a Detective from Montgomery County Police Department travelled to Detroit, Michigan, to interview [T.B.] and collect DNA

samples from her and her child, [P.C.]. Each of the DNA samples were swab samples taken from their mouths.

After [T.B.] completed her direct testimony, [Campbell], representing himself, commenced his cross-examination of [T.B.]. At the outset of his cross-examination, [Campbell] asked [T.B.] "I took you from Michigan, brought you to Maryland, and sexually assaulted you, and stole your virginity?" [T.B.] responded "yes" and said that she came to Maryland with him in order to "get away from the foster home" that she was staying in. [T.B.] also stated that she trusted [Campbell] because he "portrayed [himself] as a good dude." [Campbell] then asked, "were you being held hostage?" and [T.B.] responded that "yes", she was held hostage. [Campbell] then asked [T.B.] if she said, "that I was sexually assaulting you twice a week for a year, right?" [T.B.] responded "yes", and was next asked "was there a time, as a result of those sexual assault, you became pregnant?" [T.B.] responded "yes" and further responded to [Campbell's] question by stating he never wore a condom when he was raping her.

[Campbell] also asked [T.B.] if there had been any communications between you and myself "when I literally got locked up in 2013 until the van incident?" [T.B.] responded "yes" and that the communications were through phone calls and JPay's.[2] [T.B.] also stated that about thirty to forty pictures were sent to her from [Campbell]. [T.B.] was then asked by [Campbell], "in May of 2012, you wrote a letter to the judge to try to get me out of jail. Do you recall that letter?" [T.B.] replied to [Campbell], "yes" but that "you [Campbell] told her what to write in the letter. I wrote it, but none of the words are my own." [T.B.] explained to the jury that [Campbell] "had me send the letter back, and rewrite it, because you [Campbell] didn't like the way it was written." Next, [Campbell] asked, "did you want your father to get out of prison?" and [T.B. responded "no."

[Campbell] then turned to the van incident. He asked [T.B.] whether she and her friends "saw the van was spray painted?" [T.B.] stated that she saw that the van said, "the time is now, CXE with the number six." [T.B.] also testified that the number six is in reference to [Campbell]. [Campbell] continued with his next question, "when you turned right toward the walkway you saw me correct?" [T.B.] stated "yes" and that she was scared when she saw him.

The Court then paused [T.B.'s] testimony to allow the State to call their DNA expert out of turn due to witness scheduling issues. [T.B.'s] testimony resumed later in the trial. During direct examination of the DNA witness, the State asked their DNA expert if, through her scientific analysis, she had formed any expert opinions regarding the likelihood that [Campbell] is the biological father of [P.C.]. The DNA expert replied, "Yes. In the African American population database, it is 708,000,000,000 times more likely that [Campbell] is the father [of P.C.] compared to unrelated individuals." The DNA expert added, "18.1 quadrillion times more likely if the alleged father, [Campbell], is the father as compared to

---

[2] "JPay" is the abbreviation for the email system used in the jail where Campbell was held in Michigan.

unrelated individuals of U.S. Caucasian descent." The DNA expert then stated her expert opinion to a reasonable degree of scientific certainty that there is a 99.99999999 percent probability that [Campbell] is the father of [P.C.].

Following the DNA expert's testimony, [Campbell] resumed his cross examination of [T.B.]. [Campbell] next asked her if "somehow, over the three years that he was locked up far away, he brainwashed her." [T.B.] responded by specifically stating "from the time I [T.B.] left you [Campbell], in 2012, up until I [T.B.] was released to SAFE House in 2016, yes." [Campbell] then asked [T.B.] about her initial interview, about her rape claims, with forensic investigator Lauren Schimer. Specifically, [Campbell] asked if "because [P.C.] was albino that you felt like it was someone related to you [T.B.] who had inseminated you?" [T.B.] answered "yes" and [Campbell] responded by asking if she told Lauren Schimer that her half-brother, Jeremy Heising, was her rapist because she knew [P.C.] was a product of incest. [T.B.] answered [Campbell's] question by stating "[Campbell] instructed [her] to do so by any means necessary, so that you [Campbell] wouldn't get incriminated."

[Campbell] then stated that [T.B.] was angry with him. He went on to ask her if that was the case, then why did she make up facts to protect him. [T.B.] answered that "[she] has been angry with [Campbell] since 2011. What I said was merely out of fear." [Campbell] followed with, "fear of what" and [T.B.] answered [Campbell] by stating, that she was afraid "of you [Campbell], of the fact that you're [Campbell] so quick to be released from prison." Next, [Campbell] inquired of [T.B.] if Azeb "knew I was raping you" while they were living with her in the Maryland Avenue Rockville apartment? [T.B.] responded "yes" and that Azeb caught [T.B.] and [Campbell] having sex. Next, [Campbell] asked how Azeb reacted to this revelation. [T.B.] further testified, describing an incident where [Campbell] physically assaulted Azeb. Defendant then clarified the incident by asking "is this the same argument where I allegedly threw the foot stool at [Azeb], and hit her in the head, and made the big gash?" [T.B.] responded to [Campbell's] question by answering, "yes" and that incident caused her [T.B.] to be even more afraid of [Campbell].

[Campbell's] cross-examination of [T.B.] continued into the next day of the jury trial. When [T.B.] resumed the witness stand, under oath, [Campbell] next asked [T.B.] if she "ever [tell] anyone that I got you drunk before sexually abusing you." [T.B.] responded "yes" and that [Campbell] would give her alcohol occasionally. [Campbell] then asked "occasionally? Was that- for what purpose?" [T.B.] answered [Campbell's] question by stating "before you sexually assaulted me."

Next, [Campbell] inquired of [T.B.], "do you [recall] sending me [Campbell] a picture of a cucumber covered by a condom?" [T.B.] did not recall, but she did recall sending [Campbell] a picture of a dildo covered with a condom. In response, [Campbell] asked "on that picture, did you write the words, this is how

I made [P.C.]?" [T.B.] responded to [Campbell's] question by stating she did not send [Campbell] a picture stating that this is how I made [P.C.].

On redirect examination, the State asked [T.B.] why she left her foster home with [Campbell] on February 25, 2012. [T.B.] responded, that it was because [Campbell] seemed nice and would buy her gifts like the iPhone and clothing. [T.B.] then stated that she and her father, [Campbell], lived with her half-sister, Valkerie Doucet for the next week, right after she left the Michigan foster home with him. After that week, [T.B.] testified that [Campbell] drove her to Maryland to live with his girlfriend, at 37 Maryland Avenue. Next, the State asked if [T.B.] had permission from her mother to go to Maryland with Defendant. [T.B.] said no one knew she was going to Maryland with [Campbell], including her mother and grandmother.

The State then asked [T.B.] how things changed when [Campbell] got locked up three weeks after arriving in Maryland. [T.B.] responded by stating "we stopped going on outings. I wasn't allowed to leave the house. And that's when the sexual assault happened." The State then asked, "why did you obey him [Campbell] even though he was in jail?" [T.B.] answered this question by stating, "I was scared. And I knew he was getting released. And I didn't feel like there was much I could do in a whole other state. And I was only 11." The State also asked [T.B.] why she made up a story during her first interview with the Kids Talk investigators. She answered, "And I was still scared. So that's what I tried to do." [T.B.] responded to the prosecutor stating, "those were my instructions when I had ceased communication with [Campbell], to say whatever it took and do whatever it took to "have it not lead back to him, to not say what happened."

Next, the State inquired of [T.B.], why she was scared. [T.B.] responded that she "knew [Campbell] would get released again. I just seen it happen." [T.B.] also testified that [Campbell] "told me about his son Jeremy and that if I used him, that it would take the pressure off of his back because they'd have the same DNA." The State then asked if [Campbell] "in JPays [told] you to say that you had artificially inseminated yourself?" [T.B.] answered, "yes" and added that [Campbell] told her to take pictures of a dildo with a condom on it to make it seem that she artificially inseminated herself. The State then asked [T.B.] why she did this and [T.B.] answered, "because he [Campbell] told me to."

***

[Campbell] then began his sworn testimony to the jury by stating that on November 30, 2012, his mother brought [T.B.] to him in D.C. [Campbell] added that he "told [his] mother to have [T.B.] call her mother and tell her she was fine." [Campbell] then testified that it was his "good-faith belief that she [T.B.] was still in Michigan on November 30, 2012, and there was an allegation that she was kidnapped on that date." [Campbell] also told [T.B.] "she would be going back to her friend's house [in Michigan] as soon as her mother went back to work." Next, [Campbell] testified that [T.B.] "had previously been living in Rockville Town

Center when she arrived for the summer, but that option was not available."
[Campbell] then testified that his own welfare benefits had ceased before [T.B.]
arrived. As a result, [Campbell] "took [his] mother's birth certificate, scanned it,
photocopied the date, photo-shopped the date... and took [his] mother's Social
Security card so [he] could, albeit fraudulently, get benefits for her [T.B.]."

[Campbell] maintained that he and [T.B.] lived in the District of Columbia
at his other girlfriend, Desiree's apartment, describing the apartment as consisting
of four units and [T.B.] would play with other children in the back yard. [Campbell]
also testified that he and [T.B.] "spent quite a lot of time talking like we always
have done." During these conversations with [T.B.], [Campbell] testified that [T.B.]
was "very interested in sex." [Campbell] next testified that he believed from the
apartment's limited space, his daughter, [T.B.], "could hear Desiree and I engaging
in sexual activity."

[Campbell] then stated to the jury "to my utter dismay, I was forced to tell
[T.B.] that there was no way possible that I could make her come like I made
Desiree come." [Campbell] continued his testimony by stating "that if [T.B.]
wanted to experience orgasms and was going to put herself at extreme risk in one
of the highest per capita age percentages in America to do it, it was my duty, as a
parent, to save her life." [Campbell] told the jury, "so I had her go on Adam & Eve
and pick out several masturbation aids and accessories totaling over $200, that
included a, not cheap dildo . . . and other small vibrating devices with lubrication."
[Campbell] continued, "I suggested that she watch pornography, specifically,
lesbian masturbation videos to learn how to bring herself to orgasm." [Campbell]
testified "[this] was my entire contribution to [T.B.'s] sexual experience, and I
know my judgment might be questioned, but I was in an incredibly
incomprehensible predicament." [Campbell] added that he "did not realize at the
time that my contribution was quite a bit more extensive than I could have
imagined."

[Campbell] further testified, "[T.B.] took the train back to Michigan around
the middle of January 2013, [and] I did not return to 37 Maryland Avenue after she
left." [Campbell] then stated, "in April 2013, [T.B.] fell ill, and I told her to come
back and I would take her to the hospital." [Campbell] offered that [T.B.] did come
back to him and "at the hospital, it was discovered: one, that she had sepsis, and
two, that she was five months pregnant." [Campbell] offered that he "told the doctor
that [T.B.] had been living in Michigan with her friends whose parent never came
home, and that she was assaulted by five different guys at a party." [Campbell]
testified that [T.B.] "was in the hospital for almost two weeks, and I brought her
back from Howard University Hospital to the apartment in D.C." [Campbell] stated,
"I took care of [T.B.] until she delivered [and] her and Desiree got very close."
[Campbell] testified that he took [T.B.] to "the hospital in Maryland" because he
did not know "how the maternity section worked in Howard University, and it's
kind of dirty."

Next, [Campbell] testified, "we didn't need to provide a fake name [at the hospital] or all that because I had, as I stated, ordered welfare, and it came with a health card, so that's how she actually got service at Howard University." [Campbell] stated, "[T.B.] gave them the card and it had the name [Toni Campbell] and all the information was already attached to it." [Campbell] then stated, "[T.B.] [gave her daughter my last name] but it wasn't because I was the father, it was because the name that she [T.B.] was using was Toni Campbell…" [Campbell] also stated, "at that time, I had no idea who the father was."

[Campbell] also testified, "while [T.B.] was pregnant, during the first couple months, I had suggested that when she gave birth, that she give the baby up for adoption because she was only 13 years old." [Campbell] stated, "I really don't believe in giving up children for adoption [and] I certainly don't believe in abortions, but you know, you have to balance things when you're a parent, and I just felt like that would be the best option for [T.B.] at that time." [Campbell] continued, "so we talked about it, and she [T.B] agreed to do that." [Campbell] also testified that the hospital told him that the baby was ready to be released and he needed a car seat to take her home. [Campbell] continued, "there was only one car seat at the time, and that was my other daughter, Sincere's car seat, so I had to engage, as in a conversation about the car seat." [Campbell] also stated, "I engaged her about the car seat and that's when I told her that, you know, I'd had a child, but I told her with Desiree." [Campbell] then testified [T.B.] "appeared very distraught" because "she was really apprehensive about giving [P.C.] away." [Campbell] stated, "I could understand that because I spent the same days with [P.C.], and you know, she's little, an albino, and you know, she looks like you could just love her."

[Campbell] further explained to the jury, "I told her [T.B.] that I couldn't believe that she snuck into my room, took a used condom out of the trash, put it on her vibrator, poked a hole in it, and masturbated herself with it." [Campbell] then stated, "I told her that I couldn't believe she did that and that, for me, redefined the parameters of normality." [Campbell] next stated, "so after that, I decided not to leave [P.C.], I knew that was going to be a complication for my wife because I had told her that, that the baby was me and Desiree's, and I didn't know if I was going to, if I was actually the father, but you know, I wasn't going to have anything to do with the baby, and so forth and so on."

[Campbell] then testified, "[T.B.] and [P.C.] stayed there with me and Desiree until I got locked up in December, about three months later." [Campbell] continued, "for some reason, right after that case started, the police started looking for [T.B.], which was weird." [Campbell] was then "arrested for some charges, and [] was held in Montgomery County Correctional Facility from December 1st until July 21st." [Campbell] next explained, "I had a warrant" issued for parental taking and "immediately left from the Montgomery County Correctional Facility and was transferred back to Michigan Department of Corrections where they imposed a sentence of one to 15 years for a probation violation."

Next, [Campbell] testified that while he was in the Michigan Department of Corrections, "I received some pictures in the mail of [T.B.], which were sexually suggestive, which one had a cucumber with a condom over it, and on the picture, it was written, this is how I made [P.C.]." [Campbell] then told [T.B.] that he "believed [P.C.] was mine" and was going to have his mother take [P.C.] away from her. [Campbell] also told [T.B.], "that we're going to be partners, that we could work together with love for [P.C.]." [Campbell] also testified that he "believes in education and I want my children to be educated, which is why, after a struggle, we moved to Rockville." [Campbell] stated, "the reason I chose Rockville Town Center was because of Beall Elementary, which was a 92 percent efficiency rate in English and a 94 percent efficiency rate in Math."

***

The State began its cross-examination of [Campbell] by asking if he recognized State's Exhibit 14. [Campbell] stated "yes" and that State's Exhibit 14 was "the [his] commitment to jail for the custodial interference that happened in 2012." The State then asked [Campbell] "when you were speaking to the court [Michigan] about your request to have your probation transferred to Maryland, you mentioned, quote, that your wife was close to giving birth, correct?" [Campbell] answered "yes". The State followed with, "and the address that you gave the court was 37 Maryland Avenue, correct?" [Campbell] again answered "yes." Next, the State asked [Campbell] about his December 2013 incarceration and how he filed two motions to modify his bond. The State asked [Campbell], "and in those [motions], you stated that you had been a resident of Maryland since 2001 and would continue to reside in Rockville, the area where you have strong family ties, correct?" [Campbell] answered "yes" and the State asked, "you signed each of those motions before you filed them with the court, correct?" [Campbell] answered "yes."

The State continued, by asking [Campbell], "when you were in Michigan, you not only had access to phones, you also had access to the JPay email system, right?" [Campbell] answered "yes" and the State asked, "when you were incarcerated in Maryland, and [T.B.] was still staying with Aliyah Tiruneh, [who also goes by the name Azeb Tesema], you told Aliyah what [T.B.] was allowed to do and what she wasn't allowed to do, right? Yes or no?" [Campbell] answered, "I appreciate that you want me to answer yes or no, but that doesn't mean I'm going to do it." The State then asked, "was there ever a time you told [Aliyah] what [T.B.] was allowed to do?" [Campbell] answered "yes." The State then played a portion of a phone call that [Campbell] made to Aliyah about whether [T.B.] was permitted to go to a nearby water park in Rockville. Within that phone call, [Campbell] states, "I don't think so, I mean, I would let her go to (unintelligible) if it was in P.G. County." [Campbell] in that call, continues, "I don't want [T.B.] to go no place in Montgomery County, it don't make no sense, . . ., it's too risky."

After playing the phone call with Aliyah, the State then asked [Campbell], "when you were incarcerated in Michigan in 2016, you spent a lot of time speaking to your mother, and her name's Toni Campbell, correct?" [Campbell] answered

"yes". The State then asked "you told [your mother] at one point to lie for you for an upcoming hearing. Do you remember doing that?" [Campbell] answered "yes." Next, the State asked, "at the beginning of your testimony when you testified in court, you said that [T.B.] is your daughter and [P.C.] is also your daughter, correct?" [Campbell] answered "yes" and the State asked "and that's not really difficult to dispute given the DNA evidence in this case, correct? Yes or no?" [Campbell] answered "oh, yes."

The State then asked, "at one point, your mother asked you about who [P.C.]'s mother was, and you told her Desiree, right?" [Campbell] answered, "that's correct." The State continued, "your mother found out that [P.C.] was [T.B.'s] daughter from speaking to [T.B.]?" [Campbell] answered "yes." Next, the State asked, "at some point during your conversations with your mother, you told her to tell [T.B.] what to say at a hearing regarding the circumstances surrounding the van and the bus, I mean, the van and the spray paint, right?" [Campbell] again answered "yes."

Cross examination continued with the State next asking [Campbell], "You said, I need to come, I need her to come to the hearing and say that I wasn't motioning to her to come to me, I was motioning for the van to pull over, I was trying to get the van driver to go over one lane to the right, I was telling him to move over so I could pull up and see if [T.B.] was in the van, I just need her to come and be my rock, and if she's still down." [Campbell] responded to the State that the last portion of the sentence was correct. The prosecution then asked [Campbell], "your mother told you that she asked [T.B.] if she was raped, and you responded [to his mother], quote, she wasn't raped, she just likes to fuck, is that correct?" [Campbell] answered "yes."

The State also asked, "when you heard about the DNA test, you pretty much knew everything was going to come out, right?" [Campbell] answered "yes." Further, the State asked [Campbell], "on March 6, 2016, you sent [T.B.] a JPay that said, quote, you and Crunch mean the world to me. I feel so bad bringing her into the world under the circumstances, is that correct?" [Campbell] responded "yes" and the State continued, "in that same JPay, you went on to say, I'll never let her know she was an accident, is that correct?" [Campbell] answered "yes." Next, the State asked, "and you wrote another JPay on April 12, 2016 and you said, quote, 'I don't intend to fuck my relationship with my love child, is that correct?'" [Campbell] was being non-responsive to this question and after the Court admonished him to answer, he said "I don't know."

Turning to another JPay email, the State asked [Campbell] about another of his JPay emails to [T.B.], again quoting from it: "I find your actions disgusting, you don't deserve to be in [P.C.'s] life at all, I will make sure [P.C.] is much better at following instructions than you've proven to be. Is that correct?" [Campbell] answered "yes", The State continued by asking, "and you were upset because she wasn't following your instructions at that point?" [Campbell] answered, "I was

upset because she wasn't calling Crunch, her daughter, and she was not keeping in contact with her daughter, and it made me very upset because Crunch was the most important thing." Next, the State asked, "after you found out about the DNA test, you wrote another JPay on July 9, 2016, that said, "I am in the path of a speeding train and need your help." Is that correct?" [Campbell] answered "yes."

The State continued by asking [Campbell], "also in that JPay, you instructed [T.B.] about what to say about where this all occurred, right?" [Campbell] responded "yes." Next, [Campbell] was asked, "on the 16th of July, you sent a JPay [to T.B.] that said, quote, if you want our relationship to be strictly business, no playing, you need to let me know that's all, no matter what Crunch needs too, once that test is done, her destiny will forever be cast into the darkness, everyone will know the one thing we swore we would never tell. Is that correct?" [Campbell] answered, "yes, absolutely" and the State asked, "there was a JPay that was sent on July 30, 2016, that said, "there is no doubt that what he did will not pass the test of public scrutiny, but I'm sure he doesn't give a fuck about what inferior minds perceive." [Campbell] responded "oh, yeah, that's definitely me."

The State next asked, "as far as I remember, he turned dust into diamonds for her, promised her his life, and sold his soul for that pussy, it was worth that much to him." You wrote that right?" [Campbell] responded, "yes" and the State asked, "you wrote that to your then 16-year-old child with whom you shared a baby with, correct?" [Campbell] responded, "yes." Continuing with cross-examination, State asked [Campbell], "[did] you [have] a conversation about wearing leggings ... and told her that you wouldn't allow [T.B.] to wear leggings, right?" [Campbell] answered, "yes" and the State asked its next question: "you told [T.B.] that she couldn't wear leggings unless she was with you because they show off her ass, right?" [Campbell] answered, "yes." The State then asked, "when [T.B.] was here, she didn't go to school?" [Campbell] answered, "no."

\*\*\*

On re-direct examination of himself, [Campbell] began by testifying to the jury, "the prosecution addressed whether or not I was controlling people from prison, and the truth of the matter is, when you're in prison, you're in prison, you do what you have to do to get what needs to be done to the best of your ability, but there is just absolutely no way to control people." [Campbell] added, "As a parent, of a young teenage, extremely, you have no idea, promiscuous daughter, you have to be even more focused on what it is that you want for them." [Campbell] also testified that while he was in the hospital for personal injuries the police came and questioned him. [Campbell] continued that since he had a warrant in Michigan for a probation violation, he gave the police "a fake name, a fake address, I give them, you know, anything to keep from them finding out who I am."

ECF No. 9-1 at 442-465 (internal citations omitted).  On March 22, 2018, the trial court sentenced Campbell to an aggregate one hundred thirty years' imprisonment.  ECF No. 9-14 at 42-43.

### B. Direct Appeal

Campbell appealed his conviction to the Appellate Court of Maryland.[3]  ECF No. 9-1 at 215-288.  He asserted three assignments of error:

(1) Did the trial court violate [Campbell's] due process in the presumption of innocence by compelling him to present his defense in a four-day trial before the jury while conspicuously restrained by a tactical security team composed of at least three, armed Montgomery County Sheriffs forming a close proximity mobile perimeter?

(2) Is CP § 16-101 et. seq. unconstitutional with respect to indigent, pro se defendants thereby rendering trial court's application of it in this case a violation of [Campbell's] due process?

(3) Did the trial court's actions, singularly, or cumulatively, manifest error of law or rule which, when considered in the totality of the circumstances, critically affect and diminish [Campbell's] ability to receive a fair trial?

*Id.* at 220.  The Appellate Court of Maryland issued an opinion on December 18, 2018, affirming Campbell's conviction and sentence.  *Id.* at 504-534.  Campbell sought further review with the Supreme Court of Maryland,[4] which denied his petition for a writ of certiorari on March 27, 2020.  *Id.* at 551.  The United States Supreme Court also denied his petition for a writ of certiorari.  ECF No. 9-2 at 9-24; *Campbell v. Maryland*, 141 S. Ct. 1048 (2021).

### C. Motions for a New Trial

Campbell filed three motions for a new trial based on T.B. recanting her trial testimony.  ECF No. 9-1 at 87-122, 133-139; ECF No. 9-2 at 207-213.

### (i)      August 22, 2018

Campbell's August 22, 2018, motion asserted he was entitled to a new trial due to new evidence, including a letter T.B. wrote on her eighteenth birthday that completely recanted her trial testimony.  ECF No. 9-1 at 108. The trial court summarily denied the motion. *Id.* at 123.

### (ii)     December 4, 2018

On December 4, 2018, Campbell filed another motion for a new trial, again based on T.B.

---

[3] Formerly known as the Maryland Court of Special Appeals.
[4] Formerly known as the Maryland Court of Appeals.

recanting her trial testimony. *Id.* at 133-139. The trial court held an evidentiary hearing on May 8, 2019. ECF No. 9-16. T.B. testified by telephone. *Id.* at 46-91. At the time of the hearing T.B. was nineteen years old. *Id.* at 46. She testified that she lied during her father's trial when she testified about her father taking her from foster care in Michigan, about living with her father in Maryland, and about her father raping her. *Id.* at 48-59. T.B. claimed that she became pregnant with her daughter by retrieving one of her father's used condoms from the trash receptacle, placing it on a dildo, and masturbating with it. *Id.* at 59-60. T.B. also claimed that she did not tell the truth at trial because she was threatened by Michigan Child Protective Services and her grandmother. *Id.* at 64-65. T.B. testified that she told the assistant state's attorney, Elizabeth Haynos, during her father's trial, that the statement she gave accusing her father of rape was not true. *Id.* at 66-67. T.B. also testified that she recanted her trial testimony during a hearing in Michigan pertaining to the termination of her father's parental rights (*id.* at 72-79) and made calls and wrote a letter to the states' attorneys about recanting her testimony. *Id.* at 82. Before the hearing concluded, Campbell argued his position to the trial court, including an argument that the state knew T.B. lied on the stand and "permitted the testimony to go to the jury uncorrected." *Id.* at 114.

On August 15, 2019, the trial court issued a lengthy opinion denying Campbell's motion. ECF No. 9-1 at 437-488. The trial court found that Campbell had not met Maryland's standard for a new trial because T.B.'s recantation did not qualify as "newly discovered evidence" (*id.* at 475-478), was not credible in the context of all the evidence received at trial (*id.* at 478-487) and would not have affected the jury's verdict. (*Id.*). The opinion does not overtly address Campbell's allegation that the state knowingly offered perjured testimony.

Campbell appealed the denial of his motion for a new trial to the Appellate Court of Maryland. ECF No. 9-2 at 67-125. Campbell included a claim in his appellate brief that the state knowingly used false testimony at his trial. *Id.* at 105. In a reasoned opinion issued on September 9, 2021, the Appellate Court of Maryland affirmed the denial of the motion for a new trial, finding that the trial court did not abuse its discretion when it determined that T.B.'s recantation was not credible. *Id.* at 421-427. The Supreme Court of Maryland subsequently denied Campbell's petition for a writ of certiorari. *Id.* at 447.

(iii)    **January 21, 2021**

Undeterred, on January 21, 2021, Campbell filed another motion for a new trial based on T.B.'s recantation. *Id.* at 207-213. This time, Campbell argued that the "newly discovered evidence" was T.B.'s testimony at the May 8, 2018 hearing that she told Elizabeth Haynos midtrial that the rape accusation was a lie. *Id.* The trial court summarily denied Campbell's motion. *Id.* at 214. He appealed to the Appellate Court of Maryland (*id.* at 277-355), which concluded that any claims of prosecutorial misconduct were barred by *res judicata*. *Id.* at 443-446. The Supreme Court of Maryland subsequently denied Campbell's petition for a writ of certiorari.[5]

**D. Petition for Postconviction Relief**

Campbell filed a petition for postconviction relief on June 17, 2020. ECF No. 9-2 at 46-66, 128-130, 168-176. He asserted five claims:

(1) Trial court impermissibly compelled [Campbell], by applying the incorrect legal standard, to relinquish his constitutional right to self-representation in order to assert his right as an indigent defendant to be provided with the basic, necessary tools for an adequate defense at state expense. *Id.* at 48-53, 170.

(2) Trial court maliciously, or through deliberate indifference, withheld material dialogue from the consideration of the [Appellate Court of Maryland], resulting in an unconstitutional review of [Campbell's] issues regarding the violation of [Campbell's] presumption of innocence at trial, and ultimately a decision and denial based on a prejudicially incomplete record. *Id.* at 53-56, 171-172.

(3) Trial Court's utilization of Maryland Pattern Instruction 3.0 without modification, under the specific facts of [Campbell's] case, explicitly prohibited the jury from considering the bulk of [Campbell's] sworn testimony as evidence, in clear violation of his due process rights as defined by the Sixth and Fourteenth Amendment. *Id.* at 56-59, 128-130, 172.

(4) State's Attorneys Haynos and Carrara exhibited textbook prosecutorial misconduct when they failed to disclose exculpatory and material impeachment evidence to [Campbell] during trial in violation of *Brady v. Maryland* and Md Rule 4-263(d)(5), 4-263(d)(6), and 4-263(j). Further, the prosecution allowed a witness it knew or should have known was not truthful to testify, thereby presenting knowingly false evidence to the jury in clear violation of [Campbell's] right to due process as defined by the US Supreme Court in *Giglio v. United States* and *Naupe v. Illinois*. *Id.* at 59-65, 172-176.

---

[5]    The state court record did not include the denial of certiorari by the Supreme Court of Maryland. Respondents provided the petition for a writ of certiorari, so the Court confirmed this information through Maryland's online case search database, mdecportal.courts.state.md.us (last visited 6/26/2024).

(5) Evidence asserted by [Campbell], known and ignored by the State at trial, as well as newly discovered evidence manifest a unanimous consensus that even if the alleged offenses were committed at all, they did not occur in Maryland, depriving the trial court of its jurisdiction pursuant to the Sixth Amendment and rendering the subsequent conviction and sentence void ab initio. *Id.* at 65-66.

The trial court denied Campbell's petition in a written order dated December 11, 2020. *Id.* at 194-204. The Appellate Court of Maryland denied Campbell leave to appeal on March 31, 2021. *Id.* at 274-276.

### E.  Federal Habeas Petition

Campbell filed his federal petition for habeas corpus relief on December 8, 2021. ECF No. 1. He raises nine claims for relief:

(1) The state imposed a Hobson's choice on petitioner that unconstitutionally compelled him to relinquish his Sixth Amendment right to self-representation in order to assert his right to receive assistance or any basic tools necessary to present an adequate defense at state expense.

(2) The state deliberately utilized evidence it knew or should have known was inherently false in securing petitioner's conviction and the Maryland courts' failure to consider or render a ruling on this allegation of error is an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

(3) The state withheld both exculpatory and materially impeaching evidence which, according to the sworn testimony of the alleged victim, was in its possession before the conclusion of trial and the Maryland courts' failure to consider this misconduct or make a ruling thereupon is an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

(4) The trial court's utilization of Maryland Pattern Jury Instruction 3.0, What Constitutes Evidence, under the specific circumstances of petitioner's case, without modification, explicitly prohibited the jury from considering the bulk of petitioner's sworn testimony as evidence in violation of petitioner's right to due process as defined by the Sixth and Fourteenth Amendments.

(5) The trial court deliberately, or through gross negligence, withheld material dialogue from the consideration of the [Appellate Court of Maryland] resulting in an unconstitutionally deficient review of petitioner's allegations regarding the presumption of innocence at trial, and ultimately in rendering of an adverse decision based on a prejudicially incomplete record.

(6) Evidence asserted by the petitioner that was known and ignored by the state at

trial, as well as newly discovered evidence manifests a unanimous consensus by every individual with the possibility of personal knowledge of the alleged offenses that even if those offenses were committed at all, they did not occur in Maryland, depriving the trial court of its territorial jurisdiction pursuant to the Sixth Amendment, thereby rendering the subsequent conviction and sentence void.

(7) The state utilized an unjustifiably prejudicial standard of review in consideration of petitioner's claims of actual innocence and conviction based on perjured testimony which not only contravene[s] the principles of fair and impartial judicial review but indiscriminately and overwhelming diminish[es] the legal value of undeniable proof of innocence.

(8) Prosecutorial vouching.

(9) Actual Innocence/Miscarriage of Justice.

Respondents filed an Answer on February 2, 2022, arguing that Campbell's claims should be dismissed because they are non-cognizable in habeas review, procedurally defaulted, or lack merit. ECF No. 8.

## II.    PROCEDURAL DEFAULT

Procedural default occurs when the petitioner failed to present the claim to the highest state court with jurisdiction to hear it, and the state courts would now find that the petitioner cannot assert that claim. *Mickens v. Taylor*, 240 F.3d 348, 356 (4th Cir. 2001); *Breard v. Pruett*, 134 F.3d 615, 619 (4th Cir. 1998).

For a person convicted of a criminal offense in Maryland, exhaustion may be accomplished either on direct appeal or in post-conviction proceedings. To exhaust a claim on direct appeal in non-capital cases, a defendant must assert the claim in an appeal to the Appellate Court of Maryland and then to the Supreme Court of Maryland by way of a petition for a writ of certiorari. *See* Md. Code Ann., Cts. & Jud. Proc. §§ 12-201, 12-301. To exhaust a claim through post-conviction proceedings, a defendant must assert the claim in a petition filed in the Circuit Court in which the inmate was convicted within 10 years of the date of sentencing. *See* Md. Code Ann., Crim. Proc. §§ 7-101–7-103. After a decision on a post-conviction petition, further review is available through an application for leave to appeal filed with the Appellate Court of Maryland. *Id.* § 7-109. If the Appellate Court of Maryland denies the application, there is no further review available, and the claim is exhausted. Md. Code Ann., Cts. & Jud. Proc. § 12-202.

A procedural default occurs when a habeas petitioner fails to exhaust such available state remedies and "the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred." *Breard*, 134 F.3d at 619 (quoting *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991)).  Maryland law does not permit a second and successive state petition for post-conviction relief. *See* Md. Code Ann., Crim. Proc. § 7-103(a).

A procedural default also may occur where a state court declines "to consider the merits [of a claim] on the basis of an adequate and independent state procedural rule." *Yeatts v. Angelone*, 166 F.3d 255, 260 (4th Cir. 1999); *see also Gray v. Zook*, 806 F.3d 783, 798 (4th Cir. 2015) ("When a petitioner fails to comply with state procedural rules and a state court dismisses a claim on those grounds, the claim is procedurally defaulted.").  As the United States Court of Appeals for the Fourth Circuit has explained, "if a state court clearly and expressly bases its dismissal of a habeas petitioner's claim on a state procedural rule, and that procedural rule provides an independent and adequate ground for the dismissal, the habeas petitioner has procedurally defaulted his federal habeas claim." *Breard*, 134 F.3d at 619 (citing *Coleman*, 501 U.S. at 731-32).

Respondents argue that Ground Two, which alleges prosecutorial misconduct for the use of perjured testimony based on *Napue v. People of State of Ill.*, 360 U.S. 264 (1959), is defaulted because the postconviction court found the claim waived. ECF No. 8 at 83-84.  Respondents also argue that Ground Three, which alleges prosecutorial misconduct for suppression of favorable evidence pursuant to *Brady v. Maryland*, 313 U.S. 83 (1963), is defaulted because the postconviction court found the claim waived. For the following reasons, the Court disagrees.

During the May 8, 2019 hearing on Campbell's motion for a new trial (12/4/2018), Campbell squarely argued a prosecutorial misconduct claim based on the use of perjured testimony, "the state had full knowledge that [T.B.] was lying on the stand and allowed her testimony to go to the jury uncorrected." ECF No. 9-16 at 114.  Discussed in detail below, the trial court issued a lengthy opinion addressing Campbell's motion, but did not explicitly address Campbell's oral argument about the alleged perjured testimony.  ECF No. 9-1 at 437-488. Campbell again raised the prosecutorial misconduct argument in his appeal (ECF No. 9-2 at 105), which was also not explicitly addressed in the Appellate Court of Maryland's opinion affirming

the trial court. ECF No. 9-2 at 421-427.  The Supreme Court of Maryland denied Campbell's petition for certiorari. ECF No. 9-2 at 447.

Campbell asserted his perjured testimony claim again in his January 12, 2021 motion for a new trial (*Id.* at 207-213), which was summarily dismissed by the trial court. *Id.* at 214.  The Appellate Court of Maryland concluded: "any issue as to prosecutorial misconduct related to the recantation could have, and should have, been raised at the [May 8, 2019] hearing.  The relitigation of the recantation is barred by the doctrine of res judicata." *Id.* at 446.

Campbell asserted his perjured testimony claim again in his petition for postconviction relief. *Id.* at 47, 59-65, 172-176.  He also asserted a claim that the prosecution suppressed evidence pursuant to *Brady v. Maryland. Id.* at 47, 59-65, 172-176.  The postconviction court concluded:

> Petitioner testified in the hearing on his Petitions that he both learned of and argued the existence of this conversation at the May 8, 2019 hearing on his motion for a new trial. Petitioner further testified that he challenged the State's attorney on that point at the hearing.  Accepting Petitioner's representation that this issue was raised and argued as grounds for a new trial, it is undisputed that his motion for a new trial was denied, and that Petitioner failed to make the allegation on his direct appeal. The issue was thus waived.  CP § 7-106(a).

Md. Code Ann., Crim. Proc. § 7-106(a), references errors that are "fully litigated":

> (a) For the purposes of this title, an allegation of error is finally litigated when:
>
> (1) an appellate court of the State decides on the merits of the allegation:
> (i) on direct appeal; or
> (ii) on any consideration of an application for leave to appeal filed under § 7-109 of this subtitle; or
>
> (2) a court of original jurisdiction, after a full and fair hearing, decides on the merits of the allegation in a petition for a writ of habeas corpus or a writ of error coram nobis, unless the decision on the merits of the petition is clearly erroneous.

Md. Code Ann., Crim. Proc. § 7-106.

Respondents argue that § 7-106(a) and *res judicata* are independent and adequate state grounds that procedurally bar Campbell's claims, but Respondents fail to meet their burden of proof. *See Jones v. Sussex I State Prison*, 591 F.3d 707, 716 (4th Cir. 2010) ("Because procedural default constitutes an affirmative defense in habeas cases, the burden rests with a state to prove the adequacy of the relied-on procedural bar.").  The record reflects that Campbell fully litigated

his perjured testimony claim (Ground Two) through the Supreme Court of Maryland when he appealed the denial of his motion for a new trial (12/4/2018). The record also reflects, by clear and convincing evidence, that Campbell had not previously asserted a *Brady* claim (Ground Three) before his postconviction petition. Respondents have not cited any authority for the proposition that § 7-106(a) or the doctrine of *res judicata* is adequate to procedurally bar a claim under these circumstances.[6] The Court finds that Grounds Two and Three are not procedurally barred.

Next, Respondents argue that Ground Four is procedurally defaulted because it was dismissed on direct appeal pursuant to the contemporaneous objection rule. ECF No. 8 at 88-92. Campbell argued on direct appeal, that the trial court erred in failing to alter Maryland Pattern Jury Instruction 3.0 because he testified from the counsel table instead of the witness stand. ECF No. 9-1 at 531-534. The Appellate Court of Maryland dismissed the assignment of error, finding that Campbell failed to object at trial. *Id.* Because the Appellate Court of Maryland enforced Maryland's contemporaneous objection rule, Ground Four is procedurally defaulted. *See Lowe v. Dovey*, No. CV SAG-20-3429, 2023 WL 131042, at *5 (D. Md. Jan. 9, 2023) (concluding that Maryland's contemporaneous objection rule is an independent and adequate state ground sufficient to bar federal habeas review); *Wainwright v. Sykes*, 433 U.S. 72, 85 (1977) (holding that a federal habeas petition who failed to comply with a state's contemporaneous objection rule must show cause for the procedural default to obtain habeas review).

Respondents argue that Ground Six is procedurally defaulted because the postconviction court concluded the claim was waived due to Campbell's failure to raise it on direct appeal. ECF No. 8 at 101. Campbell contends in Ground Six that the trial court lacked jurisdiction because the offenses did not occur in Maryland. The record, indeed, reflects that Campbell did not bring Ground Six in his direct appeal (ECF No. 9-1 at 140-209) and the postconviction court dismissed Ground Six pursuant to Md. Code Ann., Crim. Proc. § 7-106(b)(1)(ii) because he failed to bring the claim on direct appeal. ECF No. 9-2 at 203. Md. Code Ann., Crim. Proc. § 7-106(b) is a state procedural rule that is adequate to bar federal habeas review. *See Joppy v. Dovey*, No. CV GLR-19-1445, 2022 WL 1567647, at *4 (D. Md. May 18, 2022); *Hinton v. Acuff*, No. CV GJH-20-0374, 2022 WL 17094582, at *7 (D. Md. Nov. 18, 2022).

---

[6]     The Court additionally finds rebutted, by clear and convincing evidence, the Appellate Court of Maryland's conclusion that Campbell failed to litigate his prosecutorial misconduct claim during the proceedings associated with his December 4, 2018 Motion for a New Trial. *See Mahdi v. Stirling*, 20 F.4th 846, 895 (4th Cir. 2021).

Respondents next argue that Ground Eight is procedurally defaulted because Campbell never raised a claim of prosecutorial vouching with the state courts. ECF No. 8 at 109. Campbell concedes that Ground Eight is procedurally defaulted but asks that the default be excused because he is actually innocent. ECF No. 26-3 at 51-52. Campbell's actual innocence claim is addressed in Section III, *infra*.

The Court finds that Grounds Four, Six and Eight are procedurally defaulted. If a procedural default has occurred, a federal court may not address the merits of a state prisoner's habeas claim unless the petitioner can show (1) both cause for the default and prejudice that would result from failing to consider the claim on the merits; or (2) that the failure to consider the claim on the merits would result in a miscarriage of justice, specifically, the conviction of one who is actually innocent. *See Murray*, 477 U.S. at 495-96; *Breard*, 134 F.3d at 620. "Cause" consists of "some objective factor external to the defense [that] impeded counsel's efforts to raise the claim in state court at the appropriate time." *Breard*, 134 F.3d at 620 (quoting *Murray*, 477 U.S. at 488). To demonstrate prejudice, the petitioner must show "not merely that the errors at his trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982); *see Murray*, 477 U.S. at 494. Under the second exception, a petitioner may obtain review of procedurally defaulted claims if the case "falls within the 'narrow class of cases . . . implicating a fundamental miscarriage of justice.'" *Schlup v. Delo*, 513 U.S. 298, 314-15 (1995) (quoting *McCleskey v. Zant*, 499 U.S. 467, 494 (1991)). Such cases are generally limited to those for which the petitioner can show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray*, 477 U.S. at 496.

## III.   ACTUAL INNOCENCE

Campbell argues that the default of Grounds Four, Six and Eight should be excused through the actual innocence exception to procedural default. ECF No. 26-3 at 51. He also claims in Grounds Seven and Nine that he is entitled to habeas relief because he is actually innocent.

"[A] credible showing of actual innocence may allow a prisoner to pursue his constitutional claims on the merits notwithstanding the existence of a procedural bar to relief." *McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013). "[The] fundamental miscarriage of justice exception, is grounded in the equitable discretion of habeas courts to see that federal constitutional errors do not result in the incarceration of innocent persons." *Id*. "In certain exceptional cases involving a

compelling claim of actual innocence, however, the state procedural default rule is not a bar to a federal habeas corpus petition." *House v. Bell*, 547 U.S. 518, 522, (2006) (citing *Schlup,* 513 U.S. at 319–322).

"[P]risoners asserting innocence as a gateway to defaulted claims must establish that, in light of new evidence, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" *House*, 547 U.S. at 536-37 (quoting *Schlup*, 513 U.S. at 327). Stated differently, "[a] petitioner's burden at the gateway stage is to demonstrate ... that more likely than not any reasonable juror would have reasonable doubt." *Id.* at 538. "To be credible, ... a claim [of actual innocence] requires petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup*, 513 U.S. at 324. "If new evidence so requires, this [review] may include consideration of the credibility of witnesses presented at trial." *House*, 547 U.S. at 538-39 (citation omitted).

The Supreme Court "caution[ed], however, that tenable actual-innocence gateway claims are rare: 'A petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror acting reasonably would have voted to find him guilty beyond a reasonable doubt.'" *Perkins*, 569 U.S. at 386 (brackets omitted) (quoting *Schlup*, 513 U.S. at 329). "It is not the district court's independent judgment as to whether reasonable doubt exists that the standard addresses; rather the standard requires the district court to make a probabilistic determination about what reasonable, properly instructed jurors would do." *Schlup*, 513 U.S. at 329. The gateway actual innocence "standard is demanding and permits review only in the extraordinary case." *House*, 547 U.S. at 538 (citation omitted); *see, e.g.*, *Perkins*, 569 U.S. at 401 ("We stress once again that the [actual innocence] standard is demanding."); *Wilson v. Greene*, 155 F.3d 396, 404 (4th Cir. 1998) ("Claims of actual innocence . . . presented . . . as gateways to excuse a procedural default . . . should not be granted casually.").

The Circuit Court made factual determinations pertaining to Campbell's actual innocence claim when it decided his December 4, 2018 motion for a new trial. The Court must determine, as an initial matter, the level of deference to which these factual determinations are entitled. "Where a state court looks at the same body of relevant evidence and applies essentially the same legal standard to that evidence that the federal court does under [the actual innocence analysis], Section 2254(e)(1) requires that the state court's findings of fact not be casually cast aside." *Sharpe*

*v. Bell*, 593 F.3d 372, 379 (4th Cir. 2010). The Court is also required to defer to any factual findings made by the trial court that are relevant to Campbell's claims of actual innocence. *See Winston v. Kelly*, 592 F.3d 535, 557 (4th Cir. 2010) ("AEDPA deference under § 2254(e)(1), however, will be appropriate to any relevant factual findings made by the Virginia Supreme Court.").

Campbell is asking the Court to consider two pieces of "new" evidence: (1) a Michigan probation violation report, and (2) T.B.'s recantation of her trial testimony. Because T.B.'s recantation was part of Campbell's motion for a new trial (12/4/2018), the Court will defer to the Circuit Court's factual conclusions in determining whether actual innocence has been established, but the Michigan probation violation report was not part of any of Campbell's state court motions and therefore the review of that evidence will be *de novo*.

Campbell argues that the Michigan probation violation report (ECF No. 9-2 at 351) demonstrates that he could not possibly have impregnated T.B. because he was incarcerated in Michigan from February 7, 2012-March 22, 2012 and again from March 28, 2012-August 6, 2012. ECF No. 26-2 at 38-52. However, this report may not[7] qualify as "new" evidence because it was available to Campbell at the time of trial. Campbell attempted to introduce the report as an exhibit, but the state's objection on the grounds of hearsay was sustained. ECF No. 9-9 at 83-86. In any event, Campbell cannot meet the actual innocence standard because, as explained in more detail below, scientific evidence, combined with Campbell's own words, provided proof beyond a reasonable doubt that he impregnated his twelve-year-old daughter through sexual intercourse. No reasonable juror would be swayed by a probation report that merely limited Campbell's window of opportunity to commit the offense.[8]

---

[7]  The Court notes that a circuit split exists regarding whether "new evidence" means "newly discovered" or "newly presented." *Reeves v. Fayette SCI*, 897 F.3d 154, 161–62 (3d Cir. 2018), as amended, (July 25, 2018). The Eighth Circuit has held that "evidence is new only if it was not available at trial and could not have been discovered earlier through the exercise of due diligence." *Amrine v. Bowersox*, 238 F.3d 1023, 1028 (8th Cir. 2001). The Seventh Circuit and Ninth Circuit have held that federal habeas petitioners may demonstrate an actual innocence claim through "newly presented" exculpatory evidence, that is, evidence not presented to the jury at trial. *See Gomez v. Jaimet*, 350 F.3d 673, 679–80 (7th Cir. 2003); *Griffin v. Johnson*, 350 F.3d 956, 963 (9th Cir. 2003). Likewise, the Courts of Appeals for the First, Second, and Sixth Circuits have intimated that petitioners may establish actual innocence claims through newly presented evidence. *See Riva v. Ficco*, 803 F.3d 77, 84 (1st Cir. 2015); *Cleveland v. Bradshaw*, 693 F.3d 626, 633 (6th Cir. 2012); *Rivas v. Fischer*, 687 F.3d 514, 543, 546–47 (2d Cir. 2012).

[8]  Campbell argues that the report limits his window of opportunity to just six days, but the testimony at trial established that P.C. was born on August 21, 2013, which calls this argument into question.

As explained above, Campbell argued in his December 4, 2018 motion for a new trial that he was actually innocent because T.B. lied during her trial testimony about living with him in Maryland and lied that he had raped her.  After considering the evidence presented at trial, along with the testimony of T.B. offered at the evidentiary hearing, the Circuit Court concluded that T.B.'s recantation of her trial testimony was not credible.  ECF No. 9-1 at 437-488.  The Circuit Court pointed to the DNA evidence offered at trial establishing that Campbell was P.C.'s father—a fact that he does not dispute.  *Id.* at 479.  The Circuit Court concluded that Campbell's alternative explanation for how T.B. became pregnant was not believable based on Campbell's testimony, which suggested a sexually inappropriate relationship with his daughter:

> "to my utter dismay, I was forced to tell [T.B.] that there was no way possible that I could make her come like I made Desiree come." [Campbell] also testified that he had [T.B.] "go on Adam & Eve and pick out several masturbation aids and accessories totaling over $200, that included a, not cheap dildo . . . and other small vibrating devices with lubrication." [Campbell] admitted to instructing [T.B.] to "watch pornography, specifically, lesbian masturbation videos to learn how to bring herself to orgasm."

*Id.* at 480.

The Circuit Court also found Campbell's emails to his daughter from jail in Michigan ["JPay"] suggested a sexual relationship.  *Id.* at 481.  The Circuit Court listed the following JPay emails that were introduced at trial:

- April 12, 2016: Campbell referenced P.C. as his and T.B.'s "love child"

- July 16, 2016: "if you want our relationship to be strictly business, no playing you need to let me know that's all, no matter what [P.C.] needs too, once that test is done, her destiny will forever be cast into the darkness, everyone will know the one thing we swore we would never tell."

- July 30, 2016: "there is no doubt that what he did will not pass the test of public scrutiny, but I'm sure he doesn't give a fuck about what inferior minds perceive…as far as I remember, he turned dust into diamonds for her, promised her his life, and sold his soul for that pussy, it was worth that much to him."

*Id.* The Circuit Court went on to find improbable T.B.'s explanation that she became pregnant by masturbating with one of Campbell's used condoms.  *Id.* at 482-485.  The Circuit Court found significant the fact that Campbell sent T.B. a JPay on July 9, 2016, in which he "lays out for her, in graphic, almost script-like fashion, the difficult circumstances of his 'friend,' in which he had learned about a girl who masturbated with a used condom, got pregnant, and falsely accused a man

of rape." *Id.* at 483. The Circuit Court noted that T.B. testified at trial for five hours and forty-seven minutes, in "significant graphic detail about how [Campbell] sexually abused her countless times." *Id.*

Campbell argues that the Circuit Court erred because it found T.B.'s trial testimony to be credible over her May 8, 2018, hearing testimony. ECF No. 26-3 at 5-9. Campbell argues that this conclusion is an unreasonable application of the facts because of the number of times that T.B. changed her story, including before, during, and after the trial. *Id.* However, the jury could have completely discounted all of T.B.'s testimony and still found Campbell guilty of the offenses charged. The DNA evidence established paternity (ECF No. 9-10 at 122-134) and reasonable jurors would have rejected T.B.'s alternative explanation for how she was impregnated, when considering Campbell's admissions of an inappropriate relationship during his testimony and his admissions of a sexual relationship in the emails with T.B.

Reasonable jurors also would have rejected T.B.'s alternative explanation for her pregnancy considering the evidence introduced at trial of Campbell's psychological impact on her. The testimony at trial demonstrates that Campbell had significant control over T.B.'s bodily and personal autonomy. When she lived with her father in Maryland, she did not attend school (ECF No. 9-9 at 24), was not allowed to talk on the phone (ECF No. 9-10 at 76) and was not allowed to open the door. *Id.* at 76. Campbell instructed her to hide when the police came to the door looking for her. *Id.* at 91. He prohibited T.B. from wearing leggings unless he was with her because, "they show off her ass." ECF No. 9-12 at 72-73. T.B. testified that Campbell would physically assault her when she attempted to resist the rapes. ECF No. 9-9 at 45. T.B. explained that she initially lied about her brother raping her because her father told her not to incriminate him (ECF No. 9-10 at 88-89) and her father told her to lie about how she got pregnant by saying that she artificially inseminated herself. *Id.* at 89-90. T.B. testified multiple times that she was afraid of Campbell. ECF No. 9-10 at 76, 86, 93.

In sum, Campbell cannot meet the standard for the actual innocence exception to procedural default because he has failed to produce *reliable* evidence that would have caused no reasonable juror to find him guilty beyond a reasonable doubt. Grounds Four, Six and Eight are therefore procedurally defaulted. As explained below, even if these claims were not procedurally defaulted, they would be dismissed for lack of merit.

Campbell also contends in Grounds Seven and Nine that he is entitled to habeas relief because he is actually innocent. However, the Supreme Court has never held that habeas relief extends to freestanding claims of actual innocence. *Herrera v. Collins*, 506 U.S. 390, 404-405 (1993). "Courts have consistently emphasized that actual innocence for the purposes of *Schlup* is a procedural mechanism rather than a substantive claim." *Finch v. McKoy,* 914 F.3d 292 (4th Cir. 2019) *citing Teleguz v. Pearson*, 689 F.3d 322, 327 (4th Cir. 2012). Grounds Seven and Nine cannot form the basis for habeas relief and are dismissed.

## IV.   STANDARD OF REVIEW

In analyzing Campbell's petition for a writ of habeas corpus, the Court is bound by the standard of review for the Antiterrorism and Effective Death Penalty Act ("AEDPA"). The Court may grant the writ on a claim adjudicated on the merits in a state court proceeding only if the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," or involved an "unreasonable application of such law," or was based on "an unreasonable determination of the facts in light of the evidence presented in the State court proceedings." 28 U.S.C. § 2254(d)(1); 28 U.S.C. § 2254(d)(1)(2); *Harrington v. Richter*, 562 U.S. 86, 100 (2011); *Bell v. Cone*, 535 U.S. 685, 693-94 (2002); *Williams (Terry) v. Taylor*, 529 U.S. 362, 379 (2000).

In assessing a petitioner's habeas claims, the district court looks to the opinion of "the last reasoned decision of a state court addressing the claim." *Allen v. Stephan*, 42 F.4th 223, 247 (4th Cir. 2022), *cert. denied sub nom. Chestnut v. Allen*, 143 S. Ct. 2517 (2023), quoting *Woodfolk v. Maynard*, 857 F.3d 531, 544 (4th Cir. 2017). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 364–365. "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the [petitioner's] case." *Id.* at 407.

In other words, to obtain relief on his petition, Campbell must identify the "clearly established" legal principle on which he relies. To qualify as "clearly established," a principle must originate from an actual Supreme Court holding, not from its passing dicta. *See White v.*

*Woodall*, 572 U.S. 415, 419 (2014).   Campbell also must describe this holding with specificity. *See Brown v. Davenport*, 596 U.S. 118 (2022).   He cannot recite a holding at a "high level of generality." *Lopez v. Smith*, 574 U.S. 1, 6–8 (2014) (per curiam) (citation omitted); *Metrish v. Lancaster*, 569 U.S. 351, 367–68 (2013).   Circuit precedent cannot turn "a general principle of Supreme Court jurisprudence into a specific legal rule" that has not been stated by the Supreme Court. *Lopez*, 574 U.S. at 7, quoting *Marshall v. Rodgers*, 569 U.S. 58, 64 (2013).

If relying on the "unreasonable application" clause, Campbell next must show that the state court engaged in an "unreasonable application" of clearly established law.   Under this test, a federal court's belief that a state court committed an error when applying a legal principle to the facts of a case does not suffice.   Rather, the federal district court must be able to describe the state court's application as "objectively unreasonable[.]" *White*, 572 U.S. at 419 (quoting *Lockyer v. Andrade*, 538 U.S. 63, 75–76 (2003)).   To warrant that description, a state court must have committed "an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103.

Campbell faces an additional hurdle if he alleges a trial court error that the state court subjected to harmless error review.   Under these circumstances, a federal court cannot grant habeas relief without applying both the test outlined in *Brecht v. Abrahamson*, 507 U.S. 619 (1993), and the deferential review required by AEDPA. *Brown*, 596 U.S. 118. *Brecht* requires a state prisoner seeking to challenge his conviction in collateral federal proceedings to show that the error had a "substantial and injurious effect or influence" on the outcome of his trial.   507 U.S. at 637 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).   A "substantial or injurious effect or influence" means "actual prejudice." *See id.* at 637–38.   A "federal court must *deny* relief to a state habeas petitioner who fails to satisfy either [*Brecht*] or AEDPA.   But to *grant* relief, a court must find that the petition has cleared both tests." *Id.* at 134.   To succeed on any of his trial error claims, Campbell must convince this federal habeas court that there is grave doubt about his verdict *and* demonstrate that every fairminded jurist would agree that the error was prejudicial. *Id.* at 1525.

As discussed in detail below, these standards foreclose Campbell's claims.

## V.   DISCUSSION

### A. Ground One

In Ground One, Campbell contends that the trial court violated his constitutional rights because it forced him to decide between his right to self-representation and access to funding for experts he needed to support his defense.

After Campbell discharged his public defender, he filed a Motion for Ex Parte Hearing to Establish Necessity for Appointment of Expert Witness.  ECF No. 9-1 at 76-79.  The trial court held a hearing on the motion on August 7, 2017.  ECF No. 9-7 at 4-41.  Campbell indicated that he primarily sought expert funding to challenge the state's DNA evidence.  *Id.* at 5.  The trial court received testimony from the public defender's office explaining that the office does not provide expert funds to defendants it does not represent.  *Id.* at 15.  The trial court examined the applicable law and explained to Campbell that once he discharged his public defender there was no avenue for him to access expert funding.  *Id.* at 25-26.  The trial court then placed Campbell under oath and questioned him for the third time about his decision to represent himself, explaining that he would not have access to expert funding. *Id*. at 40-41.  Campbell confirmed that he still intended to represent himself.  *Id.*

Citing *Ake v. Oklahoma*, 470 U.S. 68 (1985), Campbell argued on direct appeal that the trial court's ruling violated his constitutional rights.  ECF No. 9-1 at 234-240.  The Appellate Court of Maryland rejected Campbell's claim:

> Here, appellant could have obtained a state-funded expert witness had he accepted representation by O.P.D.  Instead, appellant chose to reject that service and represent himself.  Pursuant to [Maryland precedent], refusing to provide a state-funded expert witness under those circumstances was consistent with the governing statute and appellant's constitutional rights....

*Id.* at 520.

Campbell argues that the trial court impermissibly infringed upon his right to self-representation by not providing him with funding for expert services, and that the Appellate Court of Maryland's opinion is contrary to clearly established federal law under *Faretta v. California*, 422 U.S. 806 (1975) and *Ake v. Oklahoma*, 470 U.S. 68 (1985).  ECF No. 26-1 at 5-20.  Campbell argues that he was forced to give up one constitutional right to vindicate another.  *Id.* at 11-14.

Under the Sixth and Fourteenth Amendments, criminal defendants have a right to proceed without counsel and represent themselves at trial when they voluntarily and intelligently elect to

do so. *Faretta,* 422 U.S. at 807.  In *Ake v. Oklahoma*, the Supreme Court held that a defendant has a constitutional right to the appointment of a psychiatrist when he "demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial." 470 U.S. at 83. But "*Faretta* says nothing about any specific legal aid that the State owes a pro se criminal defendant." *Kane v. Garcia Espitia,* 546 U.S. 9, 10, (2005) (per curiam); *see also*, *Handy v. Giurbino*, No. CV 03-4204 ABC AJW, 2013 WL 3467063, at \*15 (C.D. Cal. July 8, 2013) (finding that federal habeas relief is unavailable based on the denial of expert funding to a self-represented defendant).

The Supreme Court held in *Faretta* that a defendant has the right to represent himself, which Campbell exercised. The Supreme Court also held in *Ake* that the state must appoint to the defendant a psychiatrist when sanity is a significant factor at trial.  But, the error in Campbell's argument is that the United States Supreme Court has never said that defendants who exercise the right to self-representation also have the right to expert funding.  Campbell was not forced to give up one constitutional right to vindicate another because he never had a clearly established constitutional right to expert funding.  Because habeas relief cannot be granted unless the state court decision is contrary to a holding of the United States Supreme Court, Ground One is without merit.[9]

## B. Grounds Two and Three

In Grounds Two and Three Campbell contends that the prosecution engaged in misconduct because it knew that T.B.'s testimony was not true ("*Napue*" claim).  In Ground Three Campbell contends that the prosecution engaged in misconduct because it failed to disclose T.B.'s mid-trial revelation that she lied ("*Brady*" claim).

As an initial matter, the Court will address Campbell's argument that these claims should be reviewed *de novo*. ECF No. 26-3 at 27.  Campbell argues that the trial court "overlooked" his *Napue* claim.  *Id*.  To be sure, as noted above, Campbell fairly presented a *Napue* claim in his motion for a new trial (12/4/2018) and the state courts did not explicitly address the claim. Campbell did not present a *Brady* claim in the motion for a new trial (12/4/2018), but he did present

---

[9]     Assuming, *arguendo*, *Ake* would be extended to Campbell's case, he could not meet the threshold requirement for appointment of an expert per the Fourth Circuit Court of Appeals.  *See Page v. Lee,* 337 F.3d 411, 415–16 (4th Cir. 2003) (defendant must illustrate: "(1) he will be deprived of a fair trial without the expert assistance, or (2) there is a reasonable likelihood that it will materially assist him in the preparation of his case").  Campbell claimed he needed to challenge the state's DNA evidence, but Campbell did not dispute P.C.'s paternity at trial. ECF No. 9-10 at 133, 222; ECF No. 9-12 at 59.

a *Brady* claim in his petition for postconviction relief. ECF No. 9-2 at 59-65, 172-176. The postconviction court concluded that the *Brady* claim was waived pursuant to § 7-106(a), which, as discussed above references "fully litigated" claims.

The Court's determination of the standard of review is guided by the United States Supreme Court opinion in *Johnson v. Williams*, 568 U.S. 289 (2013). In *Williams*, the United States Supreme Court explained, "The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) restricts the circumstances under which a federal habeas court may grant relief to a state prisoner whose claim has already been 'adjudicated on the merits in State court.'" *Id.* at 292 (quoting 28 U.S.C. § 2254(d)).

> A judgment is normally said to have been rendered "on the merits" only if it was "delivered after the court ... heard and *evaluated* the evidence and the parties' substantive arguments." And as used in this context, the word "merits" is defined as "*[t]he intrinsic rights and wrongs of a case as* determined by *matters of substance,* in distinction from matters of form." If a federal claim is rejected as a result of sheer inadvertence, it has not been evaluated based on the intrinsic right and wrong of the matter.

*Id.* at 303 (internal citations omitted) (emphasis in original).

However, "[w]hen a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits— but that presumption can in some limited circumstances be rebutted." *Id.* at 301. "When the evidence leads very clearly to the conclusion that a federal claim was inadvertently overlooked in state court, § 2254(d) entitles the prisoner to an unencumbered opportunity to make his case before a federal judge." *Id.* at 303.

The facts and substantive arguments associated with Campbell's *Napue* claim were presented to the trial court during the May 8, 2019 hearing on Campbell's motion for a new trial (12/4/2018). The trial court's written opinion addressed the issue of whether Campbell was entitled to a new trial by focusing on the credibility of T.B.'s recantation testimony. T.B.'s credibility was dispositive to Campbell's claim for actual innocence and his *Napue* claim. For this reason, the Court cannot say that the presumption that the trial court adjudicated the *Napue* claim on the merits has been rebutted.

It does appear, however, that the postconviction court overlooked the *Brady* claim. The *Brady* claim was not before the trial court when the opinion on the motion for a new trial

(12/4/2018) was issued, but the postconviction court determined that it had been fully litigated. Thus, the merits of Campbell's *Brady* claim were not adjudicated by the state courts. But, the Court will defer to the trial court's factual findings on T.B.'s credibility because those findings are relevant to Campbell's *Brady* claim. *See Winston,* 592 F.3d at 557.

Accordingly, the Court will apply AEDPA deference to Campbell's *Napue* claim and to any factual findings made by the state courts that are relevant to Campbell's *Brady* claim. However, the Court's conclusion is not altered based on the level of deference applied to Grounds Two and Three because the Court finds that these claims also lack merit on *de novo* review.

Under the Supreme Court's decision in *Napue v. Illinois*, the Government may not knowingly use false evidence, including false testimony, to obtain a tainted conviction or allow it to go uncorrected when it appears. False testimony includes both perjury and evidence that, though not itself factually inaccurate, creates a false impression of facts which are known not to be true." *Burr v. Jackson*, 19 F.4th 395, 410 (4th Cir. 2021) (alterations adopted) (citations and internal quotation marks omitted). A *Napue* claim thus "requires a showing of the [(1)] falsity and [(2)] materiality of testimony and [(3)] the prosecutor's knowledge of its falsity." *Basden v. Lee*, 290 F.3d 602, 614 (4th Cir. 2002). A petitioner can show materiality for *Napue* purposes "if there is *any reasonable likelihood* that the false testimony *could have affected* the judgment of the jury." *United States v. Agurs*, 427 U.S. 97 (1976) (emphasis added), *holding modified by United States v. Bagley*, 473 U.S. 667 (1985); *accord Daniels v. Lee*, 316 F.3d 477, 493 (4th Cir. 2003).

*Brady v. Maryland* instructs, "the suppression by the prosecution of evidence favorable to an accused" violates due process where the evidence is "material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87 (1963). For a court to find a *Brady* violation, it must determine that the evidence was 1) favorable to the accused, 2) suppressed by the prosecution (either willfully or inadvertently), and 3) material. *Banks v. Dretke*, 540 U.S. 668, 691 (2004). Evidence that is favorable to the accused includes both exculpatory (whether requested by defendant or not) and impeachment evidence. *Id.*; *see Bagley,* 473 U.S. at 676 (holding that the *Brady* rule includes impeachment evidence).

Campbell cannot prevail on the *Napue* claim or the *Brady* claim if T.B.'s testimony that she recanted her allegations to the prosecution midtrial is not credible. As discussed in Section III, *supra*, the trial court concluded that T.B.'s recantation was not believable because, *inter alia*,

the DNA evidence established that Campbell was P.C.'s father, Campbell's testimony and emails to T.B. demonstrated a sexual relationship with T.B. and he fathered P.C. through sexual intercourse, and testimony at trial established that Campbell exerted control over T.B.'s physical and mental autonomy. The Court defers to the trial court's conclusions on T.B.'s credibility. The Court also reaches the same conclusion on *de novo* review. The recantation does not overcome the strength of the DNA evidence, the inculpatory statements made by Campbell in his emails to T.B., and Campbell's testimony at trial that demonstrated a sexually inappropriate relationship with his daughter.

Campbell cannot establish that the testimony offered by T.B. at trial was false or that the prosecution suppressed material evidence. Grounds Two and Three are dismissed for lack of merit.

## C. Ground Four

Campbell contends in Ground Four that the trial court erred by instructing the jury with Maryland Pattern Instruction No. 3.0. Specifically, Campbell argues that the trial court should have altered the jury instruction because he testified from the counsel table instead of the witness stand. As noted above, Ground Four is procedurally defaulted. Nevertheless, the Court finds that Ground Four lacks merit.

Before Campbell testified on the third day of trial, August 16, 2017, the trial judge gave Campbell an option. ECF No. 9-10 at 215-216. He could either testify from the counsel table and have easy access to his materials or take the witness stand. *Id.* Campbell elected to take the witness stand. *Id.* at 220. When Campbell's testimony continued the next day, August 17, 2017, he elected to testify from the counsel table. ECF No. 9-12 at 15.

When the trial court went over the proposed jury instructions, Campbell did not object to Maryland Pattern Instruction No. 3.0 (*id.* at 110), which reads (in pertinent part): "In making your decision, you must consider the evidence in this case. That is, testimony from the witness stand and physical evidence or exhibits that have been admitted into evidence." *Id.* at 149.

Campbell argued on direct appeal and argues again in Ground Four that the trial court erred because a significant portion of his testimony took place at the counsel table and Maryland Pattern Instruction No. 3 instructed the jury to only consider testimony "from the witness stand." ECF No. 26-2 at 12-22. The Appellate Court of Maryland concluded on direct appeal that the trial court

did not err in giving the jury instruction because it was identical to Maryland's pattern instruction. ECF No. 9-1 at 533.

In any event, Campbell cannot demonstrate that he was prejudiced by the language of the jury instruction. Harmless error analysis applies to instructional errors so long as the error at issue does not categorically "vitiate[e] *all* the jury's findings." *Neder v. United States*, 527 U.S. 1, 11 (1999). An instructional error that omitted the location of the defendant's testimony when defining evidence qualifies for harmless error analysis. The language of the jury instruction did not deprive Campbell of "basic protections without which a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence." *Id.* at 8, citing *Rose v. Clark*, 478 U.S. 570, 579, (1986).[10]

As explained throughout this opinion, the strength of the evidence against Campbell was overwhelming. The Court cannot say that the failure of Maryland Pattern Instruction 3.0 to include additional language regarding Campbell's testimony from the counsel table had a "substantial and injurious effect" on the verdict. *Brecht*, 507 U.S. at 637. As such, Campbell cannot meet the standard for habeas relief on Ground Four and it would be dismissed even if it was not procedurally defaulted.

**D. Ground Five**

Campbell contends in Ground Five that the trial court withheld dialogue from the trial transcript, which resulted in deficient review. Particularly, Campbell argues that the trial transcript transmitted to the Appellate Court of Maryland omitted a discussion where he objected to how close the sheriff's deputies positioned themselves to him in the courtroom. The Court finds Ground Five lacks merit.

Respondents argue that Ground Five should be dismissed because it is non-cognizable in federal habeas review.[11]  ECF No. 8 at 93-100. The Court agrees. Campbell fails to state a

---

[10]     The Court rejects Campbell's argument that Ground Four is a structural error because it infringed on his right to testify in his own defense. ECF No. 26-2 at 18-22. Ground Four is an instructional error and the record reflects that the trial court provided Campbell with an unfettered opportunity to testify in his own defense, of which he took full advantage. ECF No. 9-10 at 221-246; ECF No. 9-12 at 14-86.

[11]     Respondents also argue that Ground Five is procedurally defaulted because Campbell waived the claim on direct appeal. ECF No. 8 at 94. On direct appeal, Campbell filed a Motion to Correct the Record with a complete transcript. ECF No. 9-1 at 124-131. The Appellate Court of Maryland summarily denied the motion. *Id.* at 132. The state subsequently filed a separate Motion to Correct the Record. *Id.* at 489-496. The motion acknowledged that the transcript referred to by Campbell in his motion was incomplete, but it was his burden to supply the appellate court with the completed version and asked the appellate court to order Campbell to supplement the record with the

constitutional error. At most, Campbell complains that the trial court has failed to comply with state law appellate procedures. *See Estelle v. McGuire,* 502 U.S. 62, 67–68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.").

To the extent that Ground Five could be construed as asserting the merits of his underlying claim that he was prejudiced by security measures in the courtroom, the Court also finds that the claim is without merit. Campbell asserted a claim on direct appeal, that the trial court violated his due process and presumption of innocence because he was "compell[ed]…to present his defense in a four-day trial before the jury while conspicuously restrained by a tactical security team composed of at least three, armed Montgomery County Sheriffs forming a close proximity mobile perimeter." ECF No. 9-1 at 220.

The Appellate Court of Maryland described the presence of the sheriff deputies in the courtroom:

> As the court explained when it first broached the subject at trial, the sheriffs would only follow [Campbell] if he chose to approach the witness stand, which he did not have to, and that, if that happened, the sheriffs would stay at a distance that allowed them to maintain courtroom security while also permitting [Campbell] "to do what [he] need[ed] to do approaching the witness stand." The court also made clear that the deputies would not be "disruptive;" that they would act in the "least invasive way;" and that they would "quietly move behind [Campbell]." Finally, the court stated emphatically that there would be "no reference whatsoever to the fact that [appellant] was in custody."

ECF No. 9-1 at 514. The Appellate Court of Maryland concluded that the court's use of security personnel was not so inherently prejudicial that it denied his right to a fair trial. *Id.* at 513.

Respondents have submitted to the Court the portion of the transcript that Campbell complains was not included in the record reviewed by the Appellate Court of Maryland. ECF No. 9-11. On August 17, 2017, the fourth day of trial, the following dialogue occurred between the trial court and Campbell:

> THE COURT:    All right, I'll reserve on that, but I'm not taking up any more time of this jury while we go through every objection you want to make now. So, are there any more? I'm going to give

---

completed transcript. *Id.* Campbell opposed the state's motion, commenting that the issues were "resolved" with his motion, and he should not have to submit the transcript. *Id.* at 497-500. The Appellate Court of Maryland decided it was "unnecessary" to decide the state's motion. *Id.* at 516-517. The Court finds that the claim is non-cognizable and pretermits a discussion on whether it is also procedurally defaulted because the postconviction court found it to be waived under these circumstances.

you a couple minutes right now, and then we're going to get this trial started, and you can take them up at another time.

MR. CAMPBELL:   Yeah, because the last one was just about the officer sitting behind me when I testified.

THE COURT:   You mean the deputy sheriff?

MR. CAMPBELL:   Right.

THE COURT:   Okay, so as we've discussed several times, the sheriffs are, the province of the sheriffs in this courthouse and in this courtroom are to control security from every aspect. It is their duty, and it is their responsibility. And as you know, you are in custody, and the deputies have that responsibility. So, they're not sitting right on top of you. They're sitting over next to the jury box, and that is their prerogative. And I've discussed this with you –

MR. CAMPBELL:   They –

THE COURT:   Sir, I'm talking. I've discussed this issue with you several times. I told you, you had the option days ago, before the trial even started, two choices. One, remain at counsel table and the sheriffs will not move about the courtroom when you move. Or two, take the witness stand, understanding that, or approach, or want to approach the witness stand with the witness, the sheriffs will be at an appropriate distance behind you, to maintain their obligation to maintain court security, so that's what they're doing. So, every, so this record is clear, every time you move, one of them does move. They either step to the front of the counter in front of the clerk, which, when you're at the bench, which is about six feet away, and it's about two feet distance from where they are right now. Or one of them, if you get up and come up to the witness stand, they stay right in the same exact spot. When you're testifying, sir, you are a prisoner. That is their responsibility. So, they are entitled to maintain security, and they are entitled to do so. And I have asked them to stay back as far as they can, rather than stay right next to you, so that you do have the ability, as you've asked, to take the witness stand.

MR. CAMPBELL:   (Unintelligible.)

THE COURT:   I've told you the options. Stay at the desk or take the witness stand.

MR. CAMPBELL:   I'm only making the objection so that it can be clear on the record that the deputies are sitting behind me and only me,

|                | and they didn't sit behind anybody else when they testified. And it makes it look like I'm in custody. |
|----------------|---------|
| THE COURT:     | Okay, there are not deputies in the plural sitting behind you. There will be one deputy sitting at a distance of about five feet away from the witness stand, because that is the choice you've made, and those are the two options I have. Stay at the desk; they don't move. Take the witness stand; they're going to move. |
| MR. CAMPBELL:  | I understand. |

*Id.* at 15-18.[12]

The Supreme Court has held that three considerations militate against the use of [restraints] during a criminal trial: (1) the presumption that the defendant is innocent until proved guilty; (2) the right to counsel and to secure a meaningful defense; and (3) a dignified courtroom process. *See Illinois v. Allen,* 397 U.S. 337, 343, 353 (1970); *Gideon v. Wainwright,* 372 U.S. 335, 344 (1963); *Coffin v. United States,* 156 U.S. 432, 458–59 (1895); *see also Deck v. Missouri,* 544 U.S. 622 (2005). The right to a presumption of innocence is relative to other rights, namely the safety of jurors, courtroom personnel, and trial spectators. *See United States v. Samuel,* 431 F.2d 610, 615 (4th Cir.1970).

The United States Supreme Court has recently confirmed that a habeas corpus claim for the use of restraints in the courtroom must satisfy the *Brecht* standard of "substantial and injurious" effect on the outcome of the trial. *Brown v. Davenport*, 596 U.S. 118, 122, (2022). Campbell cannot meet this standard. First, Campbell told the jury when he elected to testify in his case in chief that he was currently incarcerated:

> "December 1st, 2013, the defendant was arrested and continuously incarcerated for a good, good period of time. **Actually, still.**"

ECF No. 9-12 at 81 (emphasis added). Moreover, Campbell cannot demonstrate that the presence of the sheriff deputies, as described by the trial court (ECF No. 9-11 at 15-18), prejudiced the outcome of the verdict. As described in Section III, and Section IV(A), (B), & (C), due to the overwhelming evidence against him, Ground Five cannot survive harmless error analysis.

---

[12] The Court interprets the Respondents' decision to provide the Court with a copy of the transcript of the August 17, 2017 proceedings and argue its contents, notwithstanding the fact that it was not part of the record reviewed by the Appellate Court of Maryland, as an affirmative waiver of any argument that the transcript of the August 17, 2017 proceedings (ECF No. 9-11) is barred from consideration by this Court by *Cullen v. Pinholster*, 563 U.S. 170 (2011) or 28 U.S.C. § 2254(e)(2).

### E. Ground Six

In Ground Six Campbell contends that the trial court lacked jurisdiction over his claim because the offenses did not occur in Maryland. Ground Six is procedurally defaulted, but notwithstanding the procedural default, it lacks merit.

At trial, T.B. testified that her father raped her in Montgomery County, Maryland. ECF No. 9-9 at 22-23, 25, 32-33, 92. When she testified at the May 8, 2019 hearing on Campbell's Motion for a New Trial (12/4/2018), T.B. recanted that testimony, and testified that she lived with her father and his girlfriend, Desiree, in Washington, D.C. ECF No. 9-16 at 52. T.B. testified that she lied at trial when she said she lived with her father in Montgomery County, Maryland. *Id.* at 54.

Campbell argued in his petition for postconviction relief that the trial court lack territorial jurisdiction over his prosecution based on T.B.'s recantation testimony. ECF No. 9-2 at 47, 65-66. As noted above, the claim is procedurally defaulted because the postconviction court determined Campbell failed to bring the claim on direct appeal. ECF No. 9-2 at 203.

Even if Ground Six was properly before the Court it would be dismissed. Campbell cannot establish the factual basis for Ground Six because the Court's conclusions regarding the credibility of T.B.'s recantation testimony also apply to this claim.

### F. Ground Eight

In Ground Eight Campbell contends that the prosecutor vouched for T.B.'s credibility during closing argument. For the following reasons, even if Ground Eight was not procedurally defaulted, it would be dismissed because it lacks merit.

During closing argument, the prosecutor referenced T.B.'s testimony and commented that she is "incredibly honest" and had "no motive to lie." ECF No. 9-12 at 165, 167. Campbell contends that these statements constitute prosecutorial misconduct. Campbell did not enter an objection at trial and he never presented a claim for prosecutorial vouching to the state courts.

In arguments to the jury, "[i]t is impermissible for a prosecutor to vouch for or bolster the testimony of government witnesses." *United States v. Sanchez,* 118 F.3d 192, 198 (4th Cir.1997); *United States v. Lewis,* 10 F.3d 1086, 1089 (4th Cir.1993). "Vouching occurs when a prosecutor indicates a personal belief in the credibility or honesty of a witness; bolstering is an implication by the government that the testimony of a witness is corroborated by evidence known to the government but not known to the jury." *Sanchez,* 118 F.3d at 198. While vouching and

bolstering are always inappropriate, "[i]mproper remarks during closing argument do not always mandate retrial. The relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* at 198 (*citing United States v. Mitchell,* 1 F.3d 235, 240 (4th Cir. 1993)). In determining whether a prosecutor's argument prejudicially affected petitioner, the Court must consider: "(1) the degree to which the comments could have misled the jury; (2) whether the comments were isolated or extensive; (3) the strength of proof of guilt absent the inappropriate comment; and (4) whether the comments were deliberately made to divert the jury's attention." *Sanchez,* 118 F.3d at 198.

When viewed in context, the prosecutor's comments do not constitute improper vouching. The prosecutor summarized T.B.'s testimony and argued that the content of the testimony suggested its truthfulness:

> Not only that, [T.B.] was incredibly honest. She told you when she lied. When she was confronted about the Kids-Top interview, she said, yeah, I lied about that. I said it was other people. I said, I didn't say it was my dad. But she also gave you very believable understandable reasons as to why she did that.
>
> ***
>
> And then we have [P.C.]. She is the strongest evidence that we have with that defendant committed these crimes behind a reasonable doubt. This beautiful, vibrant, 4- year-old girl, is the physical manifestation of what the defendant did to his own daughter. She is 99.89 percent his daughter, chance that it's daughter rather than somebody else's in the population. [Campbell] admitted that she's his daughter. And, his version, his fabrication of how that happened, is preposterous. We know that because we have common Sense. And you can use your common sense in determining that. We know that because we listened to a tape of it. The defendant has every motive to lie. He has a history of making people lie for him. [T.B.] has absolutely no motive to lie.

ECF No. 9-12 at 165, 167. Reiterated throughout this opinion is the strength of the evidence against Campbell. In the context of the entire trial, the Court cannot say that the isolated comments infected the trial to an extent that Campbell was denied due process. As such, if Ground Eight was not procedurally defaulted, it would be dismissed for lack of merit.

## VI. MOTION FOR AN EVIDENTIARY HEARING

Campbell filed a Motion for an Evidentiary Hearing, seeking to supplement the state court record. ECF No. 29. He also filed a Motion for Extension of Time to file a reply to the Respondents' opposition. ECF No. 34. Campbell contends that the trial transcripts are incomplete and believes that the "omissions were the deliberate manipulation of the…digital recording system

by the judge, clerk of court, or court reporter." *Id.* at 1-2. While unclear, it appears that Campbell seeks to compel the state to produce a transcript that is consistent with what he considers complete. Campbell's motion does not explicitly state which claim or claims he believes the additional evidence he seeks would substantiate.

The Supreme Court has held that "[i]f a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that state court." *Cullen v. Pinholster,* 563 U.S. 170, 185 (2011). In such a circumstance, any evidentiary hearing in federal court is unwarranted, as new evidence adduced during such a hearing could not be considered in making the determination under § 2254(d)(1). Because the Court was able to thoroughly and properly review the merits of all of Campbell's claims on the face of the state court record, Campbell has failed to demonstrate that the record is "materially incomplete." *See Winston v. Pearson*, 683 F.3d 489, 496 (4th Cir. 2012).

As to the claims that were not adjudicated on the merits in the state court, the Court has dismissed those claims as procedurally defaulted. Campbell failed to meet the standard to excuse the procedural default through the actual innocence exception. Even if Campbell had been able to excuse his procedural default, 28 U.S.C. § 2254(e)(2) is an arduous hurdle to an evidentiary hearing in federal court. The statute prohibits an evidentiary hearing in federal court unless the habeas petitioner can demonstrate, *inter alia*, "the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." *Id.* That, Campbell cannot do.

For these reasons, Campbell's Motion for an Evidentiary Hearing (ECF No. 29) and Motion for an Extension of Time (ECF No. 34) are DENIED.

### VII.   CERTIFICATE OF APPEALABILITY

Rule 11(a) of the Rules Governing Section 2254 Cases provides that the district court "must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Because the accompanying Order is a final order adverse to the applicant, 28 U.S.C. § 2253(c)(1) requires issuance of a certificate of appealability before an appeal can proceed.

A certificate of appealability may issue if the prisoner has made a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When a district court rejects constitutional claims on the merits, a petitioner may satisfy the standard by demonstrating that

"reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Campbell has not made the requisite showing. Accordingly, the Court declines to issue a certificate of appealability. Campbell may still request that the United States Court of Appeals for the Fourth Circuit issue such a certificate. *See Lyons v. Lee*, 316 F.3d 528, 532 (4th Cir. 2003).

**VIII.   CONCLUSION**

For the foregoing reasons, the Court will deny Campbell's Petition for Writ of Habeas Corpus, Motion for an Evidentiary Hearing (ECF No. 29), Motion for an Extension of Time (ECF No. 34), and decline to issue a Certificate of Appealability. A separate Order follows.

July 18, 2024
_____
Date

_____
LYDIA KAY GRIGGSBY
United States District Judge

39